**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-80913-CIV-ALTMAN/Brannon**

**JULIE REGINA**,

       *Plaintiff*,

*v.*

**THE WEISS GIFTED AND**
**TALENTED SCHOOL, INC.**,

       *Defendant.*
_____/

**ORDER**

After local regulators instructed the Weiss School to cut costs, the School decided not to renew some of its employees' contracts and brought in a communications director to boost enrollment. One such unrenewed employee—our Plaintiff, Julie Regina—is convinced that the real reason for her dismissal was the School's bias against her semi-advanced age. But, because she hasn't adduced *any* evidence of discriminatory motive, the Weiss School's Motion for Summary Judgment is **GRANTED**.

**THE FACTS**

**I.**      **The Defendant**

The Weiss Gifted and Talented School (the "Defendant," the "Weiss School," or simply the "School") is a private, non-profit school accredited by the Florida Council of Independent Schools ("FCIS"). *See* Defendant's Statement of Facts ("Def. SOF") [ECF No. 36] ¶ 1.[1] In September 2015,

---

[1] The Court will cite to the Def. SOF only where the Plaintiff has failed to rebut a proposition asserted in that document. S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

FCIS performed a "comprehensive review and evaluation" of the Defendant as part of its regular reaccreditation process. *Id.* ¶ 7. The FCIS submitted a report to the Defendant consisting of "commendations"—for things the Defendant did well—and "recommendations" for ways in which the Defendant could begin to comply with FCIS standards. *See* FCIS Report [ECF No. 34-5]. But the Report noted that "there is concern regarding the assets to liability ratio." *Id.* at 4. Because the Defendant's "asset to liability ratio of 0.8 to 1" violated FCIS/FKC 3.8.7, the Report recommended that "the school must work to bring its asset-to-liability ratio into compliance with **FCIS/FKC standard 3.8.7**." *Id.* (emphasis in original).

In October 2015, about a month after the School received the Report, the Head of School, Dr. Denise Spirou, resigned—effective at the end of that year—because "[t]he Board wanted to go in a different direction on how I managed the school and it didn't match my philosophy[.]" Spirou Dep. [ECF 42-1] at 18. As she remembered the problem,

> [The Board of Trustees] wanted me to let go of about [six][2] staff members. We had multiple conversations before that and I explained to them that this is a great team in place; that maybe it's not what you see as right, but it's what I see as the right way. Then also they wanted me to put parents in their place, not give them a voice, and I said "That's not my personality. I'm a proactive person. I may not always agree with parents, but we have to listen to them." And I distinctly remember saying that, "You want me to make changes in the school?" and they said, "Well, what, can't you do it?" I said "No, I can make changes, but I don't want to do it. I like who I am and it's just time for me to move on. You need somebody that, you know, just doesn't have the emotional aspect of it and is just very business-oriented."

*Id.* Dr. Spirou later claimed that the Board of Trustees wanted her to fire the six teachers "because they didn't like the teachers who were on staff and they wanted to make changes." *Id.* at 31.

In December 2015, after Dr. Spirou told the School that she wanted to resign, the School hired Dr. Tammy Ferguson to replace her. Def. SOF ¶ 16. But Dr. Ferguson agreed to take the job only if the School hired her colleague, Dr. Rudolph Collum. *See* Ferguson Dep. [ECF No. 34-7] at 13.

---

[2] Dr. Spiro initially said seven, but then admitted that "I stand corrected, it was six members, not seven." *Id.* at 30.

As Dr. Ferguson explained, she had "built this kind of resume working side-by-side with Dr. Collum, so [she] would not have taken the position if he would have said no . . . because [she] like[d] working with the team that [she] can trust." Ferguson Dep. at 31. Dr. Ferguson got her wish. Dr. Collum accepted a position as Chief Operating Officer in December 2015. *See* Def. SOF ¶ 21. So, by January 2016, Dr. Ferguson and Dr. Collum were in place as (respectively) the new Head of School and COO.

As COO, Dr. Collum's responsibilities were diffuse: mostly, he handled financial tasks—like budgeting and fundraising—but he also oversaw other aspects of the School's operations, such as facilities maintenance and security, cafeteria supervision, technology, and "administrative miscellanea." Collum Job Description [ECF No. 34-10] at 2.[3]

To ease the transition from Dr. Spirou to Dr. Ferguson, the Defendant asked Dr. Spirou to remain as Head of School and to allow Dr. Ferguson to shadow her for several months. *See* Def. SOF

---

[3] Dr. Collum's job required him to

> "provide[] leadership in achieving the goals of the Board of Trustees in support of its stated beliefs and priorities," to "[p]lan[] and direct[] all aspects of the school's operational policies, objectives, and initiatives," to "[p]rovide[] overall supervision and advise[] the Board of Trustees and Head of School on all matters relating to business, financial, personnel, facility, construction and maintenance, security, food services, technology, management information systems, and general school operational issues," to "[m]anage[] the processes in planning, developing, reviewing, presenting, and monitoring operating, capital, and fundraising budgets," to be "[r]esponsible for the financial management, auditing process, financial record keeping, financial reporting and the development of resources for the school," to be "[r]esponsible for the attainment of short and long-term financial and operational goals," to "[o]versee[] the implementation and management of all school technology initiatives and assure[] integration within all school operational areas," to be "[r]esponsible for the management of all aspects of the school including repairs/maintenance, safety, cleanliness, potentially modernization, and school-level issues related to building security," to "[o]versee the development and implementation of long-range educational facility plans and potential construction/expansion of new educational facilities," to "[a]dminister[] cost-effective and timely implementation of all projects and strategic plan initiatives pertaining to and within all areas of school operations," to "[d]irect the development of the organization to ensure future growth," and to "[p]erform[] other duties as assigned."

Collum Job Description at 2.

¶ 23; Spirou Dep. at 42. By March 2016, however, Dr. Ferguson had assumed day-to-day control of the School. *See* Spirou Dep. at 42.

From the start, Dr. Ferguson understood that her "top priority" was to "increase the asset to liability ratio so that the school could meet accrediting standards. To do this, the Weiss School had to reduce expenses." Ferguson Decl. [ECF No. 34-1] ¶ 4. To that end, Dr. Ferguson "looked at every person's schedule, their teaching time, percent of teaching time in front of students and evaluated that as to whether that should be a full-time position, part-time position or no position." Ferguson Dep. at 48. Dr. Ferguson explained her thinking this way:

> So when I can go can [sic] into a school that's in a deficit model, I see how much of that, of staff that I can absorb into what I do, and so that's really my analysis, is how much of that can I absorb. So we can look at if I can absorb it and do it. Because anytime you go into a new school and you are trying to turn it around, three years is the grind and we know that, it's 12 hours a day kind of grind. So I look at their job duties to see what I can absorb so that I can look at eliminating positions that I can take on that job.

*Id.* at 51. In the end, she decided that "easily Ms. Suzanne Otero's job could be eliminated as the Assistant Head of School and Julie Regina's job could be eliminated as the Assistant Head of School." *Id.* at 52. Those "were the two administrators" whose job duties Dr. Ferguson ultimately absorbed. *Id.* at 55.

But Dr. Ferguson did not limit her cuts to the administrative payroll only; she also made cuts at the faculty level. So, for instance, the Weiss School had a music teacher (making $100,000 a year) and a teaching artist (earning $70,000 a year). *Id.* at 110. After seeing that the music teacher was working "maybe 50 percent, if that much," Dr. Ferguson eliminated the teaching artist position. *Id.* Dr. Ferguson also cut a "Media Specialist." *Id.* at 112.

Dr. Ferguson then sought to increase revenue. She replaced the vacant "Director of Communications" with a "Director of Marketing, Admissions, and Communications." Collum Decl. [ECF No. 34-11] ¶ 10. This new Director, Dr. Ferguson hoped, would boost enrollment—which, in

turn, would increase tuition and, by extension, revenue. Ferguson Dep. at 59. For this position, Dr. Ferguson hired her former colleague, 34-year-old Brittany Steele Theimer. Def. SOF ¶ 30. As Director of Marketing, Steele was responsible for promoting the School through various media platforms—including targeted advertising, TV, newspapers, and the internet. Steele Job Description [ECF No. 34-13].[4]

---

[4] Steele's job duties were described as follows:

> "[p]rovides leadership in achieving the goals of the Board of Trustees in support of its stated beliefs and priorities," "[p]rovides overall supervision of the Admissions Department and advises the Head of School and Chief Operating Officer on all matters relating to recruiting, admissions, and student enrollment," "[a]dministers cost-effective and timely implementation of all projects and strategic plan initiatives pertaining to and within all areas of marketing, admissions, and communication," "[c]oordinates all marketing and advertising efforts to promote the current and future growth of the school to achieve enhanced student enrollment and financial success," "[o]versees the implementation and management of all social media posts to assure integration within all school operational areas and the promotion of the school," is "[r]esponsible for the development and continued enhancement of the school's online presence through the use of Google Analytics, Blackbaud products, and other online tracking mechanisms," "[s]erves as the school's communications representative to all media outlets including newspapers, TV stations, magazines, independent reports, and social media contacts," "[c]oordinates the media presence process within the school with parents, students, staff and other school stakeholders," "[s]erves as the school's communications representative to all school staff, parents, and other school stakeholders regarding school events, announcements, schedules, and other pertinent school operational information," is "[r]esponsible for coordinating marketing and advertisement initiatives of school events and school news via multiple media outlet in the surrounding community," is "[r]esponsible for the development of school press releases related to school events, achievements, and/or announcements and coordinating with the distribution of press releases to various media outlets," "[w]ork directly with the school Parent Association (PA) to coordinate the communication and marketing processes for PA events, announcements and other   information disseminated to the school population," "[p]articipates in community outreach events to facilitate school and community partnerships," "[p]articipates on the school's leadership team in the development of the organization to ensure future growth," and "[p]erforms other duties as assigned by the Head of School."

Steele Job Description.

The parties dispute the efficacy of these cost-cutting measures. The Plaintiff maintains that there were no cuts—or, more precisely, that what cuts were made were, on the whole, ineffectual. As the Plaintiff tells it, the School paid $222,000 more in salaries in 2016–17 than it did in 2015–16 (her last year at the School).[5] *See* Weiss School Budgets [ECF No. 42-6] at 1–4. The Defendant, for its part, quibbles with the Plaintiff's numbers—characterizing the spreadsheets from which they were drawn as inadmissible drafts. *See* Reply at 5 n.2. But the Defendant also submits *other* evidence for its view that it *saved* money by shifting from a model with (1) a CFO, (2) a Director of Communications and (3)–(4) two Assistant Heads of School (with salaries of $106,568.00, $30,000.00, $76,568.00, and $68,243.00, respectively) to one with only (1) a COO and (2) a Director of Marketing, Admissions, and Communications (with salaries of $161,568.00 and $106,568.00, respectively). *See* Collum Decl. ¶ 10. This shift reduced payroll from $281,379 for four positions to $268,136 for two—savings of roughly $13,000. *See id.* ¶ 10. And, the Defendant emphasizes, the School's enrollment *increased* by 50 students.[6] *See* Ferguson Dep. at 99. Overall, then (the Defendant says), the School went from a $284,000 deficit to a $499,000 surplus. *Id.* at 115. The Plaintiff makes no effort to refute this budgetary turnaround. *See generally* Response.

## II.     The Plaintiff

In 2016, the Plaintiff, Julie Regina, was a 56-year-old Assistant Head of School. *See* Regina Dep. [ECF No. 33-1] at 10. She began working at the Weiss School in 2004 as a second-grade language-arts and social-studies teacher. *Id.* at 36. She became a fourth-grade teacher one year later and quickly picked up additional responsibilities. *Id.* She also helped teach Taekwondo, art, and "a

---

[5] $2,385,115 in 2016–17 compared with $2,162,379 in 2015–16.

[6] The "School Assessment and Action Plan"—designed for presentation to the Board of Trustees in April 2016—indicated that the School had 257 students in 2016 out of a maximum capacity of 344. *See* School Assessment and Action Plan [ECF No. 42-4] at 31–32. Even if these numbers aren't *exactly* right—the document looks like a draft—they make clear that adding 50 students represented a substantial increase in enrollment. *Id.*

couple of other assisting parts, I guess, during some of our other times during the day." *Id.* Then, in 2006, she added a job as ESE coordinator—for "Exceptional Student Education"—and worked directly with the guidance counselor. *Id.* at 39. At the end of that year, she left the classroom and became an administrator—serving full-time as guidance counselor and ESE coordinator. *Id.* By 2011, the Plaintiff had become the "Administrator for Student Services" and, in that role, continued to assume more responsibility. *Id.* at 47. So, for instance, she became the advisor for the school's chapter of National Junior Honor Society and even gave admissions tours. *Id.* at 46, 50. And, when the Head of School was away, the Plaintiff would step in as acting Head of School. *Id.* at 54. In 2013, she became the Assistant Head of School, filling a position that had been vacant for two years. *Id.* at 62. By 2016, the Plaintiff was tasked primarily with ensuring both that the School's classrooms functioned properly and that the School's curriculum met its students' needs.[7]

---

[7] The Plaintiff's job responsibilities required her:

> "[t]o act as Head of School in the Head's absence and communicate with the Head about any special situations occurring at the school," "[t]o keep the Head fully informed on student issues and all other relevant matters pertaining to school life," "[t]o sustain and enhance the school's climate and culture, involving faculty and families in support of the school's mission, vision, and values," "[t]o work to produce smooth day to day internal operations," "[t]o articulate and promote the school's mission and philosophy," "[t]o participate in the life of the school and establish a campus presence in order to retain a clear sense of the program," "[t]o maintain an active presence in the classrooms," "[t]o work closely with the Head of School in monitoring the academic climate of the school," "[t]o work closely with the Head of School and faculty in reviewing, researching, revising, and developing curriculum," "[t]o participate in the admission process and assist with admission decisions as needed," "[t]o oversee the scheduling of parent/teacher conferences, to edit and proofread all student narratives and recommendations, and to maintain records and correspondence relating to parent conferences," to "oversee the social emotional needs of all of our middle school students by working in conjunction with the child, parents, and teachers—this is fulfilled through observations, and guidance meetings with small groups, one to one, and whole classes by grade," to "[s]end out lists for guidance and ESE with specific instructions for accommodations in middle school grades 5 through 8," to "[r]eview all middle school report cards and monitor Netclassroom," to "[m]eet with Middle School Math teacher to set up and coordinate

### III.     The Conflict

On May 11, 2016, the Plaintiff asked Dr. Ferguson for an impromptu meeting—at which she asked the Head of School whether her contract would be renewed for the following year. *See* Regina Dep. at 153. Dr. Ferguson answered that it wouldn't be. *Id.* When the Plaintiff asked about other jobs at the School, Dr. Ferguson said that none were available. *Id.*[8] After she left that meeting, the Plaintiff called four of the School's five board members—one of whom (Bill Tilsen) told her that there *were* other jobs available at the School. *Id.* at 159.

---

Math Counts etc.," to "[l]esson plan meetings for Special Teachers and Middles [sic] School Teachers," to "order[] and oversee[] the standardized testing in the school/To assist the Head of School with developing summary reports on students' progress including the standardized testing/maintain inventory, and purchase testing materials for standardized testing," to oversee "[s]tudent files and records-check throughout the year to make sure all students['] immunization records and physicals are up to date," to "prepare summer files," to oversee "teacher files and records," to oversee "[t]utoring assignments of teachers to students," to provide "[g]uidance for 8th graders going to high school—High School Showcase in October or November—Send out pertinent emails and keep up to date on the End of Course assessments for High School math classes," to run "[g]ifted summer programs through Duke TIP and Johns Hopkins—sending out the paperwork for qualified students to take testing through these organizations and classes2nd-8th [sic] grades accordingly," to "[s]chedule necessary gatherings and meetings in regards to Duke TIP and Johns Hopkins or curriculum related," to "[p]ut together class lists for each new school year when we have two groups of that particular grade," to "[o]verse Title II activities and PD360—there will be meetings that I must attend during each school year—keep paperwork up to date—meet with Lower School Head," to "[g]uide the Florida Virtual students, do check up on progress reports, copy reports for files, send grades for report card postings," to "[o]versee SEVIS-keep updated-log in every 30 days and change password every 90 days-add in new I20 students and remove students as needed," to "[p]ut together elective lists for each new school year," to "[f]acilitate Florida Virtual School Students," "[t]o support the faculty and staff with student discipline and follow through the correspondence and/or related record keeping," and to "[h]andle Health Department Yearly documentation."

Regina Job Description [ECF No. 34-3].

[8] Dr. Ferguson remembers the conversation differently. *See* Ferguson Dep. at 75. But, because the Plaintiff is the non-movant, we view conflicting testimony in her favor. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

The next day (May 12, 2016), Dr. Ferguson approached the Plaintiff when she arrived at school and "said, oh I heard—Bill Tilsen told me that you talked to him and you're interested in a job[.]" *Id.* This "surprised" the Plaintiff because "[she had] told [Dr. Ferguson] the day before that [she] was interested in a job." *Id.* Dr. Ferguson added that Tilsen had "told [Dr. Ferguson] that [the Plaintiff] was interested in a job," and that "he told [Dr. Ferguson] that [the Plaintiff] was interested in possibly the language-arts position in the school." *Id.* This (again) confused the Plaintiff "because the day before there's no jobs, the interview process is at the end, okay, but now maybe there are jobs. I don't know. So I said yes, I am interested in a job." *Id.* The Plaintiff says that she could have filled—and should have been considered for—a job either as a social-studies teacher or as a language-arts teacher. *See* Regina Dep. at 154. But it's undisputed that the social-studies position was unavailable on May 11 and 12, 2016 because Dr. Ferguson had already hired Thomas Ievoli—whom she had known at her previous school—as the social-studies teacher on May 1. Pl. SOF ¶ 55; Ievoli Employment Agreement [ECF No. 42-10].

The timeline for the language-arts position is less clear. What the parties agree on is that Dr. Ferguson told the Plaintiff about the language-arts opening on May 12, 2016. Pl. SOF ¶ 36. As the Plaintiff remembers it, when she came back to school on the 12th, "[Dr. Ferguson] needed to know if I was interested in a job. I immediately told her the day before that I was interested and right then that I was interested in a job." Regina Dep. at 159. Dr. Ferguson cautioned the Plaintiff that "I don't know what a job would pay, but it won't pay you for the last nine years because you haven't been in the classroom." *Id.* at 160. The Plaintiff replied: "Well how much would that be if there was a job." *Id.* Dr. Ferguson admitted that she didn't know. *See id.* ("I don't know, I'll have to get back with you."). And "[t]hat's the way the conversation ended, that Dr. Ferguson was going to get back with me about salary and if there was a job, what it was going to be and I don't know I never heard—I didn't hear

back." *Id.*[9] On May 23, 2016, Kelsey Dougherty—whom (again) Dr. Ferguson had known from their four years together at a previous school—accepted the language-arts position. *See* Dougherty Employment Agreement [ECF No. 42-12] at 7; Dougherty Dep. [ECF No. 42-11] at 11.

The Plaintiff next heard about the language-arts position on May 26, 2016, when Dr. Ferguson presented her with a letter stating (in substance) that (1) Dr. Ferguson had offered the Plaintiff the language-arts position on May 11, 2016; that (2) Dr. Ferguson had set a May 20, 2016 deadline for the Plaintiff's response to that offer; and that (3) the Plaintiff never got back to Dr. Ferguson about the position. *See* May 26, 2016 Letter [ECF No. 42-13]. Viewing the letter as untrue—the Plaintiff insists that Dr. Ferguson never offered her the language-arts job—the Plaintiff refused to sign it. *See* Regina Dep. at 161. The Plaintiff's contract expired on June 30, 2016. *See* Def. SOF ¶ 41.

For this non-renewal, the Plaintiff has sued the Weiss School, alleging that she was fired because of her age, in violation of the Florida Civil Rights Act (Count I) and the Age Discrimination in Employment Act (Count II). Compl. [ECF No. 1] at 7–8. After a long, hard-fought litigation, the Defendant has moved for summary judgment on both counts. *See* Defendant's Motion for Summary Judgment ("the Motion") [ECF No. 35].[10] The Plaintiff, for her part, has moved for summary judgment on the Defendant's Third and Fifth Affirmative Defenses ("Mitigation of Damages" and "Claims Not Addressed in Administrative Charge," respectively). *See* Plaintiff's Motion for Summary Judgment [ECF No. 32]; Answer [ECF No. 5].[11] This Order follows.

---

[9] Dr. Ferguson says that she told the Plaintiff to advise her if she was interested in the language-arts position by May 20, 2016. Ferguson Decl. ¶ 7. On May 21, 2016, not having heard from the Plaintiff, Dr. Ferguson offered the position to another candidate, Kelsey Dougherty. *Id.*

[10] The Motion is fully briefed. *See* Response to Defendant's Motion for Summary Judgment ("Response") [ECF No. 43]; Reply in Support of Defendant's Motion for Summary Judgment [ECF No. 47].

[11] This motion is likewise ripe for adjudication. *See* Defendant's Response to Plaintiff's Motion for Summary Judgment [ECF No. 37]; Reply in Support of Plaintiff's Motion for Summary Judgment [ECF No. 41].

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the

11

record" (quoting Fed. R. Civ. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington*, 261 F.3d at 1265.

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## THE LAW

The Age Discrimination in Employment Act (the "ADEA") makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's age[.]" 29 U.S.C. § 623(a)(1).[12] To prevail in an ADEA case, a "plaintiff must prove by a preponderance of the evidence that age was the 'but for' cause of the employer's adverse decision." *Menefee v. Sanders Lead Co.*, 786 F. App'x 963, 966 (11th Cir. 2019) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

"A plaintiff in an ADEA claim may establish a claim of illegal age discrimination through either direct evidence or circumstantial evidence." *Mora v. Jackson Mem. Found.*, 597 F.3d 1201, 1204

---

[12] "Federal case law interpreting the ADEA applies to cases arising under the FCRA [Florida Civil Rights Act]." *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 960–61 (11th Cir. 2015) (cleaned up) (quoting *City of Hollywood v. Hogan*, 986 So. 2d 634, 641 (Fla 4th DCA 2008)). "Thus, [the plaintiff's] FCRA claims . . . rise or fall with the ADEA claims." *Id.* at 961.

(11th Cir. 2010). Direct discrimination requires evidence that reveals "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). "In other words, the evidence must indicate that the complained-of employment decision was *motivated* by the decision-maker's ageism. As a result, only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age will constitute direct evidence of discrimination. An example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'" *Id.* at 1358–59.

In the absence of direct evidence, courts apply the *McDonnell Douglas* test to evaluate ADEA claims that are premised on circumstantial evidence. *See Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). Under that test, an employee must first establish a prima facie case, "which creates a presumption of unlawful discrimination." *Id.* The elements of the prima facie case vary depending on the *kind* of harm the plaintiff has alleged—the two kinds being "discriminatory discharge" and "reduction in force." *Id.* In a discriminatory-discharge case, the plaintiff must show that: "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Id.*

On the other hand, when the plaintiff's position has been eliminated entirely, "the plaintiff must [1] show that he was in the protected age group and was adversely affected by an employment decision, [2] establish that he was qualified for the position held (or to assume another position) at the time of discharge and [3] present sufficient evidence from which a reasonable jury could find that the employer intended to discriminate on the basis of age through its employment decision." *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997); *see also Mitchell v. City of LaFayette*, 504 F. App'x 867, 870 (11th Cir. 2013) ("The variant test alters the fourth prong of the *McDonnell Douglas* test, that a person outside the protected class replaced the plaintiff, because, in [reduction-in-force cases],

employers rarely seek replacements for the discharged employee."). To satisfy this last prong, "the plaintiff must produce some evidence that the employer did not treat him neutrally with respect to his age, but, instead discriminated based upon it. The evidence must lead the factfinder to reasonably conclude either that the employer consciously refused to consider retraining or relocating the plaintiff due to his protected-class membership, or that the employer considered his protected-class membership as a negative factor in that consideration." *Mitchell*, 504 F. App'x at 870 (cleaned up).

In assessing whether an employer actually discharged an employee—or eliminated the employee's position—courts in this Circuit consider (1) whether a new employee assumed some (or all) of the discharged employee's responsibilities or (2) whether anyone else retained the same title. *See Minton v. Am. Bankers Ins. Grp., Inc.*, 2003 WL 21303330, at *1 (11th Cir. 2003).

"Once an employee has established a prima facie case, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Damon*, 196 F.3d at 1358. The employer's burden is "a burden of production, not of persuasion." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). Because "this burden involves no credibility determination," it is "exceedingly light." *Id.* at 769–70. "So long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." *Id.* at 770 (cleaned up).

If the employer can meet this "light" threshold, the burden shifts back to "the employee [to] show that the reason was a pretext and that unlawful discriminatory animus was the actual motivation." *Reed v. Forney Indus., Inc.*, 800 F. App'x 782, 786 (11th Cir. 2020). "An employee must meet the employer's proffered reason head on and rebut it." *Bruno v. Greene Cty. Sch.*, 801 F. App'x 681, 684 (11th Cir. 2020). The wisdom of a defendant's decision is irrelevant. The Eleventh Circuit, in fact, "has repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law." *Damon*, 196 F.3d at 1361. Courts "are not in the business

of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Id.* A plaintiff may establish pretext by "showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale. But plaintiffs may not recast the reason or merely quarrel with its wisdom." *Jones v. RS & H, Inc.*, 775 F. App'x 978, 986 (11th Cir. 2019).

ANALYSIS

The Plaintiff admits that she has no *direct* evidence of discrimination. *See* Response at 6. The question we must address today, then, is whether she has adduced enough *circumstantial* evidence of discrimination to survive at summary judgment. We begin, however, with a discrepancy in the Defendant's briefing.

For obvious reasons, the Plaintiff has proceeded in this litigation on the theory that she was discharged and that her job was replaced. *See id.* As to who replaced her, the Plaintiff points to some combination of Dr. Collum and Brittany Steele. *Id.* at 7. In other words, she unambiguously asks the Court to construe her claim as arising under the more lenient discriminatory-discharge test. *See id.* The Defendant, by contrast, can't seem to make up its mind about which test applies. On the one hand, the Defendant appears to agree with the Plaintiff that the case should be analyzed under the discriminatory-discharge framework. *See* Mot. at 5. On the other, the Defendant attacks the Plaintiff for failing to show that she was ever "replaced" in the first instance. *See id.* at 6. In saying so, of course, the Defendant seems to ask the Court to deploy the more stringent reduction-in-force test. *See id.* As a preliminary matter, then, we must decide which of these two tests to apply.

Fortunately, in a 2003 case—*Minton v. American Bankers Insurance Group*—the Eleventh Circuit tackled precisely the same question. 2003 WL 21303330, at *1. To answer it, the court compared the plaintiff's job title *and* responsibilities with his "replacement's." *Id.* Noting that no one person had assumed the plaintiff's title—and that the plaintiff's responsibilities were divided among several

different employees—the Eleventh Circuit concluded that the plaintiff had *not* been replaced. *Id.* ("[The plaintiff] had many responsibilities at the Defendant company. [The new employee] absorbed some, but not all, of [the plaintiff's] responsibilities. He assumed none of [the plaintiff's] duties, nor did he assume [the plaintiff's] title."). "Accordingly," the Court found, "[the plaintiff's] position was eliminated." *Id.*

In deciding which test to apply, of course, we must continue to view conflicting evidence in the light most favorable to the non-movant. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1272 (11th Cir. 2014) ("In this case, [the plaintiff] presented evidence which, viewed in the light most favorable to him, suggests that [the employer] replaced him shortly after his termination. On remand, the district court will need to use the standard version of the ADEA prima facie case in evaluating [the defendant's] motion for summary judgment."). Even so, this case isn't close because the Plaintiff has failed to adduce *any* evidence for her position that Dr. Collum and Ms. Steele replaced her. For starters, it's undisputed that neither Dr. Collum nor Ms. Steele inherited the Plaintiff's title as Assistant Head of School. *Compare* Collum Job Description & Steele Job Description *with* Regina Job Description. In fact, all agree that, even today, there is *no* Assistant Head of School. *See* Def. SOF ¶ 28; Pl. SOF. ¶ 28.

Nor did anyone assume the Plaintiff's job duties. The Plaintiff maintains that her responsibilities "were reassigned to Dr. Collum . . . and to Ms. Steele[.]" Response at 7. But the record unambiguously belies this contention. Ms. Steele, in fact, denied doing *any* of the Plaintiff's 20 job responsibilities—except, of course, for the six that apply to just about everybody else. So, for example, Ms. Steele admitted that, like the Plaintiff, she had a responsibility "to sustain and enhance the school's climate and culture, involving faculty and families in support of the school's mission, vision, and values" and "to participate in the life of the school and establish a campus presence in order to retain a clear sense of the program." Steele Dep. [ECF No. 42-7] at 30–37. Ms. Steele clarified, though, that

these broad responsibilities apply to all employees in common. *Id.* at 65 ("Q: So other than things that you have done as part of the scheduling committee or your participation in the admissions process or your participation in things that were every employee's or every administrator's responsibility, you don't have any of Ms. Regina's job duties today, do you? A: No.").

The Plaintiff's suggestion that Dr. Collum replaced her fares no better. The Plaintiff, in fact, doesn't identify a single one of her old job duties—nor does the Court see any—that overlap with Dr. Collum's responsibilities. *Compare* Collum Job Description *with* Regina Job Description. The Plaintiff, after all, worked with students and had nothing to do with the School's finances, *see* Regina Job Description, while Dr. Collum handles the School's finances and construction projects, not its students. *See* Collum Job Description.[13]

And Dr. Ferguson repeatedly confirmed what the Collum and Steele Job Descriptions tell us—that she wanted to see "what [she] can absorb so that [she] can look at eliminating positions that [she] can take on that job." Ferguson Dep. at 51. If anything, then, it appears that Dr. Ferguson assumed most of the Plaintiff's responsibilities.[14]

---

[13] And, while Dr. Collum does deal with student disciplinary issues, *see* Collum Job Description, the Eleventh Circuit has allowed *some* overlap, *see Minton*, 2003 WL 21303330, at *1. In *Minton*, remember, the Eleventh Circuit found that "[the plaintiff's] former duties were scattered among several employees[.]" *Id.* Still, the court concluded that the plaintiff's job was eliminated. *Id.* And this makes sense: when a company downsizes, job functions don't (usually) disappear; they are, rather (as they were in *Minton*), *redistributed* among a group of employees. There's thus nothing inconsistent about a company that, after eliminating a position, divides up some of the outgoing position's responsibilities among the remaining employees. This, in fact, is the best way to read the Plaintiff's allegations about what happened here. The Plaintiff, after all, says that her old responsibilities were redistributed among two people. As we've already said, the evidence doesn't really corroborate this claim. But the point here is that, even if the Plaintiff were right about this, her contention would only further support the Defendant's argument that her job was eliminated—and that no one person replaced her.

[14] This doesn't save the Plaintiff's claim because she never argues that Dr. Ferguson replaced her. *See generally* Response. Nor could she. Dr. Ferguson after all, took over a position (Head of School) the Plaintiff never held.

The only other evidence the Plaintiff submits in support of her claim that Dr. Collum and Ms. Steele replaced her is her testimony that, on her last day, she "had to go through all of [her] job duties descriptions with [Steele], show [Steele] where all of the files were, where all of [the Plaintiff's] materials were, go through the filing cabinets in the back rooms. So anything that [the Plaintiff] did as assistant head of school, [the Plaintiff] had to inform Ms. Steele." Regina Dep. at 151. This doesn't come close. To begin with, this checkout conversation didn't even involve Dr. Collum—so it's hard to see how it helps to implicate *him* as the Plaintiff's replacement. More importantly, there's no evidence that this conversation reflects anything more than the kind of routine exit procedure every company in America has implemented. Every company, after all, must have *some* procedure for dealing with an employee's departure—for tying up loose ends, closing open projects, and running with ongoing ones. And, of course, someone at the company has to follow that procedure—has to lead the outgoing employee through an exit interview, collect her files, transfer projects, etc. There's no reason to believe that the person who's tasked with conducting this exit interview is necessarily—or even most of the time—the outgoing employee's replacement. And the Plaintiff, for her part, never explains how (or why) Ms. Steele's involvement in the exit interview implicates *her* as the Plaintiff's replacement. Nor could she. As we've explained, a close comparison of Ms. Steele's and Dr. Collum's job titles and descriptions with the Plaintiff's reveals that neither employee assumed the Plaintiff's role.

Because, in short, the Plaintiff's position was eliminated, we must analyze her claim under the reduction-in-force test. As we explain later on, however, her claim would fail even under the more lenient discriminatory-discharge test.

## I.      Reduction in Force

Let's start with the reduction-in-force test. To recap, when the plaintiff's position has been eliminated, "the plaintiff must [1] show that he was in the protected age group and was adversely affected by an employment decision, [2] establish that he was qualified for the position held (or to

assume another position) at the time of discharge and [3] present sufficient evidence from which a reasonable jury could find that the employer intended to discriminate on the basis of age through its employment decision." *Zaben*, 129 F.3d at 1457.

The first element is easy: the parties agree *both* that the Plaintiff was in the protected age group *and* that she suffered an adverse employment action. *See* Mot. at 6; Response at 7. The second element is similarly straightforward. As the Plaintiff points out, an employee's long tenure with a company can yield an inference that the employee is qualified for the position. *See Liebman*, 808 F.3d at 1299. In *Liebman*, as here, the plaintiff had been in the same position for three years and had performed "substantially similar duties for the preceding six years." *Id.* The Eleventh Circuit found that nine years was long enough to support the inference that the plaintiff was qualified for his job. *Id.* Like the plaintiff in *Liebman*, the Plaintiff had been the Assistant Head of School for three years (between 2013 and 2016). *See* Spirou Dep. at 46. Before that, she had been the *de facto* Assistant Head of School in her role as "Middle School Coordinator." *Id.* And she was good at her job. Dr. Ferguson's predecessor—Dr. Spirou—described the Plaintiff as doing "an exceptional job, was an effective employee." *Id.* at 52; *see also id.* at 55 (reading from Dr. Spirou's 2012 assessment of the Plaintiff, which found that "Mrs. Regina has gone above and beyond her job description to ensure that this first year ran smoothly. . . . The Weiss School and I are extremely fortunate that she is part of our school."). The Plaintiff, in short, is entitled to the inference that she was qualified for her role as Assistant Head of School.[15]

---

[15] This inference cannot be rebutted by allegations of poor performance. Rather, poor performance goes to the separate question of whether a defendant had a legitimate reason for termination. *See Damon*, 196 F.3d at 1360 ("We also have unambiguously held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only *after* a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.").

But the Plaintiff falls short on the third element. To succeed at this final step, the Plaintiff must submit evidence "by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching that decision." *Vaughan v. Morgan Stanley DW, Inc.*, 158 F. App'x 205, 207 (11th Cir. 2005). In other words, the Plaintiff must show that "either the employer consciously refused to consider retraining or relocating the plaintiff due to his protected-class membership, or that the employer considered his protected-class membership as a negative factor in that consideration." *Mitchell*, 504 F. App'x at 870. Either "statistical evidence or other evidence of a pattern of terminating older workers may be used to satisfy [this prong.]" *Id.*

The problem for the Plaintiff is that she has submitted neither kind of evidence here. *See generally* Response. She advances no statistical evidence at all, identifies no pattern of terminating older employees, and never suggests that the Weiss School nefariously relies, in its termination decisions, on some proxy for age (such as pensioner status). *Id.* Nor does she claim that Dr. Ferguson, the relevant decisionmaker, made any derogatory comments about her—age-related or otherwise. *Id.* Without any such evidence, we're left with only this: (1) the Plaintiff is over 40 years old; (2) she was qualified to do her job; and yet (3) she was fired. This is plainly insufficient. As the Eleventh Circuit has explained, "the plaintiff must produce *some evidence* that the employer did not treat him neutrally with respect to his age, but, instead discriminated based upon it. The evidence must lead the factfinder to reasonably conclude either that the employer *consciously* refused to consider retraining or relocating the plaintiff due to his protected-class membership, or that the employer *considered* his protected-class membership as a negative factor in that consideration." *Mitchell*, 504 F. App'x at 870 (emphasis added & cleaned up). Since the Plaintiff has failed to adduce any evidence of *conscious* refusal or improper *consideration*, she's failed to establish a prima facie case.

## II.      Discriminatory Discharge

As we've said, however, the Plaintiff's claim would fail even under the more lenient discriminatory-discharge test.

### A.      Prima Facie Case

To establish a prima facie case under this test, the Plaintiff must show that: "(1) [s]he was a member of the protected group between the age of forty and seventy; (2) [s]he was subject to an adverse employment action; (3) a substantially younger person filled the position from which [s]he was discharged; and (4) [s]he was qualified to do the job from which [s]he was discharged." *Liebman*, 808 F.3d at 1298. We've already established that the Plaintiff meets the first, second, and fourth elements. And, assuming for a moment that she *was* replaced, only one element remains: whether her replacement was "substantially younger."

Again, this one's easy. The Eleventh Circuit has held that an age gap of *three years* can satisfy this element. *See Carter v. DecisionOne Corp. Through C.T. Corp. Sys.*, 122 F.3d 997, 1003 (11th Cir. 1997) ("[S]he completed her prima facie case by proving that she was replaced by a man three years younger than her, an age difference this court has found legally significant for ADEA purposes."). In light of *Carter*, both Dr. Collum (age 42), *see* Pl. SOF ¶ 50, and Ms. Steele (age 34), *id.* ¶ 51, could qualify as "substantially younger" than the Plaintiff (age 56), *see* Regina Dep. at 10.

If we were to apply the discriminatory-discharge test, then, the Plaintiff would succeed at establishing her prima facie case—thus shifting to the Defendant the burden of advancing "a legitimate, nondiscriminatory reason for the adverse employment action." *Damon*, 196 F.3d at 1358.

### B.      Legitimate Non-Discriminatory Reason

Of course, the Defendant has done just that. "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. While an employer's judgment or course of action may seem poor or

21

erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019). For this reason, the employer's burden—"a burden of production, not of persuasion"—is "exceedingly light." *Vessels*, 408 F.3d at 769–70. "So long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production." *Id.* at 770 (cleaned up).

The Defendant easily clears this low bar. In the wake of the FCIS report, it wanted to improve its financial standing—an objective it set out to accomplish by reducing unnecessary expenses (e.g., by having Dr. Ferguson assume the duties of both Assistant Heads of School) and increasing revenue (e.g., by hiring a Director of Marketing). Def. SOF ¶¶ 9–10, 24–28; Pl. SOF ¶¶ 9–10, 24–28. And, unsurprisingly, the Eleventh Circuit has held that financial pressure—like the kind of pressure the FCIS report placed on the School—is a "legitimate, nondiscriminatory" reason to trim one's labor force. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (11th Cir. 2013).

Because the desire to save money "might motivate a reasonable employer," the Defendant has met its "exceedingly light" burden here. *Chapman*, 229 F.3d at 1030.

### C.     Pretext

At this final step, the burden shifts back to the Plaintiff to show that the Defendant's articulated reasons are pretextual. *See Reed*, 800 F. App'x at 786. "To show pretext, the plaintiff must 'demonstrate that the proffered reason was not the true reason for the employment decision.'" *Jurriaans v. Ala. Coop. Extension Sys.*, 806 F. App'x 753, 755 (11th Cir. 2020) (quoting *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). In other words, a plaintiff must show

"*both* that the reason was false, *and* that discrimination was the real reason." *Id.* at 755 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

To satisfy this burden, a plaintiff can point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered explanation." *Id.* But "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. . . . [A]n employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. This is because "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* (cleaned up). In the end, therefore, "the inquiry into pretext centers on the employer's beliefs, not the employee's[.]" *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).[16]

The Plaintiff devotes the whole "pretext" portion of her brief to her view that the Defendant's purported concern about its bloated payroll is false. *See* Response at 10–12. In support of this position, she argues that "the record evidence establishes that Defendant did not decrease expenses or save money by eliminating Plaintiff's position[.]" *Id.* at 11. And, she adds, the FCIS report could not have been the impetus for the Defendant's (alleged) restructuring because Dr Spirou had warned the Board about the asset-to-liability ratio "long before" the FCIS report came out. *Id.* In the Plaintiff's view,

---

[16] In the absence of pretext, a plaintiff may survive summary judgment if she presents "a sufficiently persuasive 'mosaic of circumstantial evidence[.]'" *Washington v. United Parcel Serv., Inc.*, 567 F. App'x 749, 752 (11th Cir. 2014). Because the Plaintiff offers no such mosaic—and never suggests that she could—she has waived any such argument. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

then, the "Defendant cannot now use this same asset-to-liability ratio, and the known reasoning therefore, as a rationale for Plaintiff's termination." *Id.*

But there are three (main) problems with the Plaintiff's argument—all of them fatal.

*First*, even if we agree with the Plaintiff[17] that the Defendant's restructuring didn't work—because it resulted in a slight increase in salaries, *see* Weiss School Budgets at 1–4—the Plaintiff identifies no evidence for her position that the Defendant wasn't *trying* to fix its bulging budget. And, of course, at this step of the analysis, it's *the Defendant's* motive that matters. *See Alvarez*, 610 F.3d at 1266. So, for instance, the Plaintiff does not dispute that the School was suffering from an asset-to-liability ratio that concerned it accrediting agency. *See* Pl. SOF ¶ 10 (admitting that the "FCIS Report states that 'there is concern regarding the asset to liability ratio'"). Nor does she ever suggest *either* that it would have been sensible for the Defendant to ignore FCIS's concerns *or* that the School did, in fact, disregard FCIS's recommendations. Either way, the fact that the restructuring failed—or that it didn't work as intended—doesn't establish that the Defendant wasn't *trying* to fix its "concerning" asset-to-liability ratio. And that's really the end of the matter.

In this respect, our facts look a lot like *Ostrow v. GlobeCast America Inc.*, 2011 WL 4971974, at *2 (S.D. Fla. Oct. 19, 2011) (Rosenbaum, J.), *aff'd* 489 F. App'x 433 (11th Cir. 2012). In that case, as here, the plaintiff claimed that, "contrary to [the defendant's] stated intention of saving money by releasing [the plaintiff], as it turned out, [the plaintiff's] termination actually caused [the defendant] to incur additional expenses." *Id.* Judge Rosenbaum was unpersuaded. She recognized that, "even if time proved wrong [the defendant's] assumptions that it would save money by ending [the plaintiff's] employment, it matters not, as long as [the defendant] actually believed that terminating [the defendant's] employment would do so." *Id.* In other words, a defendant's failure to save money doesn't

---

[17] (as we must at this stage of the case).

establish that the defendant was lying about *trying* to save money. Judge Rosenbaum thus denied the plaintiff's motion for reconsideration and reaffirmed her previous order, in which she had (as we do here) granted the employer's motion for summary judgment. *Id.* at *3.

Our case is just the same. Dr. Ferguson, the Head of School, eliminated two Assistant Heads of School and took over their duties. She also recruited a Director of Marketing to boost enrollment (and, by extension, revenue). The Defendant's actions are thus perfectly consistent with its stated motive of reducing expenses and rebalancing its "concerning asset-to-liability ratio."[18]

*Second*, the evidence is undisputed that the Defendant's revenue *grew*, and that Dr Ferguson's efforts succeeded in turning a deficit into a surplus. Indeed, even with the slight salary bump the Plaintiff has identified, the record is pellucid (and unrebutted) that the School (1) dramatically increased enrollment, *see* Ferguson Dep. at 99 ("[W]e have increased enrollment by 50 students."), and (2) converted its deficit into a surplus, *see id.* at 115 (saying that the school went from a $284,000 deficit to a $499,000 surplus). Even taking the Plaintiff's figures as reflecting a slight salary increase, then, the Defendant's strategy worked. A Defendant can hardly be faulted for effectuating successful budgetary policy.

*Third,* even if the Plaintiff could show that the Defendant's articulated non-discriminatory reason was false, she would still lose because she has failed to establish that the "real reason" for her non-renewal was discriminatory animus. *See Jurriaans*, 806 F. App'x at 755 (noting that a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason"). Here, again, we ask

---

[18] The Plaintiff's suggestion that the Defendant's stated rationale for her non-renewal must be false because the School had known about its distended asset-to-liability ratio for years is equally misplaced. It's one thing for Dr. Spirou to know about a problem and to fail to correct it. It's another thing entirely for the School's accreditation agency to *command* the School to trim its budgets. As the Defendant points out, in an assertion the Plaintiff doesn't dispute, "[f]ailure to follow these FCIS recommendations could have led the Weiss School to [be] placed on probation or lose its accreditation." Def. SOF 13; *cf.* Pl. SOF 13 ("Undisputed.").

only what went on inside "the decision maker's head." *Alvarez*, 610 F.3d at 1266. The Plaintiff has adduced no evidence of discriminatory animus. She, in fact, points to no comments or conduct by Dr. Ferguson (the final decisionmaker) that, even arguably, support an inference of discrimination. *See generally* Response. To the contrary, Dr. Ferguson was clear—in deposition testimony the Plaintiff makes no effort to rebut—that she made the non-renewal decision by herself and that, in doing so, she *never* considered the Plaintiff's age. *See* Ferguson Dep. at 83; Ferguson Decl. ¶ 12. Instead, she swore, the decision was based solely on her "obligation to be a good steward of the Weiss School's resources." Ferguson Decl. ¶ 12. Now, if the Plaintiff had some other testimony or documents that contradicted Dr. Ferguson's assertions, then we'd deny summary judgment and let the jury decide whom to believe. But the Plaintiff has produced nothing to refute Dr. Ferguson's testimony.[19] She doesn't even include a section on this issue in her brief. *See generally* Response. And it's blackletter law that the Plaintiff's unsupported speculation about the Defendant's discriminatory intent "presents a mere scintilla of evidence of bias, which is insufficient" to survive summary judgment. *Dugandzic v. Nike*, 807 F. App'x 971, 977 (11th Cir. 2020).

Nor (as we've indicated) does the Plaintiff support her claim with any statistical evidence. Apparently, the Plaintiff was one of six employees the Defendant laid off in 2016. It would be interesting to know those employees' ages. Were they all older than the ones who remained? Younger?

---

[19] The Plaintiff gestures at an argument that she should have been retained as a language-arts teacher. Response at 8. But she doesn't put forth any evidence to support the proposition that Dr. Ferguson's stated rationale for hiring Ms. Dougherty—whom Dr. Ferguson knew and respected from a previous job—was *false. See* Ferguson Dep. at 78–79 ("Kelsey Dougherty worked for me for years. I didn't have to do an interview process. I put her though all her professional development."); *see generally* Response. Viewed in the light most favorable to the Plaintiff, the Plaintiff's testimony that she was told there were no positions available—and that, when she asked about language arts, she never heard back—supports the conclusion *only* that Dr. Ferguson deliberately hid the language-arts position from her in order to give it to her old colleague. But that's not enough—principally because there is no evidence that, in choosing Ms. Dougherty over the Plaintiff, Dr. Ferguson considered the Plaintiff's age at all. *See id.* ("Q: And it's your position that following [the Plaintiff] not getting back to you, that's when Kelsey Dougherty was contacted and that's when you offered her the position? A: I did.").

Do their ages reveal nothing at all about the Defendant's intentions? We'll never know—because neither party tells us. With an "n" of one, this Court can only say that the Plaintiff is a member of a protected class whose contract was not renewed. Under the law of our Circuit, that's not nearly enough to get to a jury.

***

Because the Plaintiff has produced no evidence—direct or circumstantial—for her position that she was let go *because of* her age, this Court **ORDERS AND ADJUDGES** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 35] is **GRANTED**.

2. The Plaintiff's Motion for Partial Summary Judgment [ECF No. 32] is **DENIED as moot**.

3. The Clerk of Court shall **CLOSE** this case.

4. Under FED. R. CIV. P. 58, the Court will enter an order of final judgment separately.

5. All other pending motions are **DENIED as moot**, all hearings are **CANCELLED**, and any deadlines are **TERMINATED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 8th day of March 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record